# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# JACKSON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* <br> DEBORAH WOODS, THERESA GHOOLSBY, <br> and TERESA RIEDER | PLAINTIFFS |
| vs. | No. 3:09-CV-00313-CWR-LRA |
| SOUTHERNCARE, INC. | DEFENDANT |

## MEMORANDUM OPINION AND ORDER

In this *qui tam* action, Deborah Woods, Theresa Ghoolsby, and Teresa Rieder ("Relators" or "Plaintiffs") are suing SouthernCare, Inc. pursuant to the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq.*[1] Before the Court are several motions to dismiss (Docket Nos. 27, 29, 31)[2] by SouthernCare, Inc., responses by the Relators, and rebuttals by SouthernCare. For the reasons stated below, SouthernCare's motions to dismiss are GRANTED in part and DENIED in part.

---

[1] The Fifth Circuit Court of Appeals has summarized the nature of a *qui tam* action as follows:

> The [False Claims Act] permits suits by private parties, called "relators," on behalf of the United States against anyone submitting false claims to the government. If the relator is successful, he keeps a percentage of the recovery. 31 U.S.C. § 3730(d). After the relator has filed suit, the action is sealed for sixty days while the government decides whether to intervene. § 3730(b)(2). If the government chooses not to intervene, the relator may proceed independently. § 3730(e)(4)(B).

*United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322, 326 n.3 (5th Cir. 2011).

[2] SouthernCare, Inc. has also filed a motion to dismiss the Relators' claims based on the FCA's public disclosure bar, 31 U.S.C. § 3730(e)(4)(A) (2006). Docket No. 25. The Court, having determined that a hearing is required for the resolution of that motion, will defer ruling on the motion. By filing its motions in a piecemeal fashion, SouthernCare has needlessly increased exponentially the number of pages of arguments to be considered by the Court. These issues could have and indeed should have been raised in one motion and arguments set forth in one round of briefing.

# I. BACKGROUND

Medicare and Medicaid are government programs that provide health coverage benefits for elderly and disabled individuals, among others. *See* 42 U.S.C. §§ 1395 *et seq*. The Medicare Hospice Benefit pays a per-diem rate for each day an eligible patient is under the hospice provider's care. Hospice care is designed to provide pain relief, comfort, and emotional and spiritual support to patients with a terminal diagnosis. Qualified beneficiaries who elect hospice care agree to forego curative treatment for their terminal condition.

In order to qualify for hospice care, the beneficiary's attending physician and the hospice program's medical director must certify that the patient is terminally ill "based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness." *Id.* § 1395f(a)(7). A terminally ill patient "has a medical prognosis that his or her life expectancy is [six] months or less if the illness runs its normal course." 42 C.F.R. § 418.3. After a patient is initially certified, Medicare Hospice Benefit provides up to two 90-day benefit periods followed by an unlimited number of 60-day benefit periods. 42 U.S.C. § 1395d(a)(4). After a benefit period has run, the patient can be recertified for hospice care only if, at that time, the medical director or physician determines that the patient has less than six months to live if the illness runs its normal course. *Id.* § 1395f(a)(7).

During the first 90 days, before a hospice provider submits a claim for payment under Medicare, a hospice provider must obtain a written or oral certification of the terminal condition from the physician or medical director in the hospice interdisciplinary group ("IDG"),[3] and from the individual's attending physician. 42 C.F.R. § 418.22. With respect to the subsequent

---

[3] An IDG group includes at least one physician, one registered nurse, one social worker, and one pastoral or other counselor. 42 C.F.R. § 418.56.

periods, the medical director or a physician in the hospice IDG may provide written or oral certification of the terminal condition. *Id.*

Medicaid, unlike Medicare, is a program through which the Federal Government financially assists states in furnishing medical care to the poor. 42 U.S.C. §§ 1396 *et seq*. In order to receive the federal funding, the state must develop a plan for providing medical assistance to the poor and satisfy certain federal requirements. *See id.* § 1396a(a); 42 C.F. R. § 431.10(b).

SouthernCare is an Alabama-based corporation that provides hospice services to patients residing in private homes, group homes, assisted living facilities, and skilled nursing facilities. As of January 2009, SouthernCare "operate[d] approximately 99 locations that provide[d] hospice services in 15 states," including Alabama and Mississippi. Docket No. 27-7, at 1. In May 2005, relator Tonja Rice brought a *qui tam* action against SouthernCare in the United States District Court for the Northern District of Alabama, Case No. CV-05-B-0873-S (referred to herein as "Rice Action"), alleging that SouthernCare "improperly enroll[ed] patients for hospice care benefits who were not properly qualified as being terminally ill" and submitted false claims for hospice benefits. Docket No. 27-1, at 2. In December 2007, relator Nancy Romeo filed a second *qui tam* action against SouthernCare in the Northern District of Alabama, Case No. CV-07-J-2325-S (referred to herein as "Romeo Action") for similar FCA violations. Docket No. 27-2. The United States of America ("Government") intervened in both cases on January 15, 2009, and an order of dismissal was entered on that date as a result of a settlement agreement reached by the parties. Docket No. 27-5; Docket No. 27-6.

Several months later, the Relators in this action, who are former employees of SouthernCare facilities in Flowood and Clinton, Mississippi, filed their *qui tam* Complaint under seal pursuant to 31 U.S.C. § 3730(b)(2), on May 28, 2009. The Relators allege, *inter alia*, that SouthernCare violated certain provisions of the FCA, *id.* §§ 3729 *et seq.*; the Stark Law, 42 U.S.C. § 1395nn; and the Anti-Kickback Statute, *id.* § 1320a-7b. The Relators aver that they "discovered and witnessed numerous cases in which SouthernCare has fraudulently admitted patients to hospice services, who do not qualify for the program." Docket No. 1 (Compl.), at 2. Further, the Relators allege that they "have witnessed cases in which SouthernCare has fraudulently re-certified patients who do not qualify for hospice service." *Id.* at 2-3.

The Government declined intervention in this matter on July 19, 2011.[4] Docket No. 18. On October 31, 2011, the Relators filed their Motion to Lift Seal and Allow Plaintiffs to Proceed. Docket No. 20. On November 1, 2011, the Court granted the Relators' motion to proceed with the prosecution.[5] Docket No. 21.

SouthernCare has moved to dismiss the Complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6). The Relators have responded, and the Court is ready to rule.

---

[4] Although the Government did not intervene, it sought leave to file a Statement of Interest Regarding the Public Disclosure Provision of the False Claims Act. Docket No. 53. The Court has granted the request of the Government and will consider its views when the Court evaluates the remaining motion to dismiss.

[5] The parties dispute whether the 120-day period for the Relators to serve SouthernCare with a copy of the Complaint began on August 3, 2011, or November 1, 2011. *See* Fed. R. Civ. P. 4(m). SouthernCare argues that the 120-day period began on August 3, 2011, the date on which the District Judge presiding over the case at that time ordered that "the complaint be unsealed and served upon the defendant by the relator." Docket No. 19. The Relators, however, note that the August 2011 order was filed under seal and in camera. *See id.* Thus, the Relators argue that the 120-day period did not begin until November 1, 2011, the day on which the Court granted the Relators' October 31, 2011, Motion to Lift Seal and Allow Plaintiffs to Proceed. The Court finds that the Relators have met the requirements of Rule 4(m), and, if not, have shown good cause. Therefore, the Defendant's Motion to Dismiss Relators' Complaint Under Fed. R. Civ. P. 4(m) & 12(b)(5), Docket No. 29, is denied.

## II. LEGAL STANDARDS

### A. Rule 12(b)(6) Standard

According to Federal Rule of Civil Procedure 12(b)(6), a complaint is properly dismissed if it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Motions made pursuant to Rule 12(b)(6) test the legal viability of a complaint. A court reviewing such a motion must afford "the assumption that all the allegations in the complaint are true," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), and determine whether the averments comprise a "plausible" right to recovery, *id.* at 570.

A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (emphasizing that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). The alleged facts must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. In short, a complaint fails to state a claim upon which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570.

Once the court has accepted the well-pled factual allegations as true, it then turns to whether the claim is plausible. *Iqbal*, 556 U.S. at 679.

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Id.* at 678 (citations omitted). Determining whether a plausible claim of relief has been adequately pled is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

**B. Rule 9(b) Standard**

"[A] complaint filed under the False Claims Act must meet the heightened pleading standard of Rule 9(b), which provides: 'In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.'" *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (quoting Fed. R. Civ. P. 9(b)). Whereas Rule 9(b) generally requires a plaintiff to plead the "time, place and contents of a false representation, as well as the identity of the person making the misrepresentation and what that person obtained thereby, the Fifth Circuit has held that this standard is not a straitjacket." *United States ex rel. Colquitt v. Abbott Labs.*, 864 F. Supp. 2d 499, 533 (N.D. Tex. 2012) (quotation marks omitted) (citing *Grubbs*, 565 F.3d at 186, 190). Therefore, in the context of a claim under the FCA presentment provision, "which makes liable any person who 'knowingly presents, or causes to be presented' a false claim to the Government," *Grubbs*, 565 F.3d at 188 (quoting 31 U.S.C. § 3729(a)(1)), "a relator's complaint, if it cannot allege the details of an actually submitted false claim, may nevertheless survive by alleging particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that false claims were actually submitted," *id.* at 190.

Lastly, "[t]he particularity requirements of Rule 9(b) apply to the [FCA's] conspiracy provision with equal force as to its 'presentment' and 'record' provisions." *Id.* at 193. Therefore, in order to sustain a claim for conspiracy to commit fraud, the plaintiff must "plead with

particularity the conspiracy as well as the overt acts [] taken in furtherance of the conspiracy."
*Id.* (citation omitted).

### III. ANALYSIS

**A. Count One: False Claims (31 U.S.C. § 3729)**

In this action, the Relators allege that SouthernCare violated the False Claims Act, 31 U.S.C. § 3729, by fraudulently certifying and recertifying patients for hospice care and "submitt[ing] false claims to the United States through Medicare and/or Medicaid" for hospice care provided to those patients. Compl. ¶ 25. SouthernCare contends that "[a] simple comparison of Relators' Complaint to the [Rice and Romeo Actions] reveals that the United States previously litigated the *same* claims against Defendant, and specifically released all such claims occurring prior to September 1, 2008." Docket No. 28, at 2. As such, SouthernCare argues that the doctrines of *res judicata* and/or collateral estoppel bar claims relating to SouthernCare conduct occurring before September 1, 2008. Indeed, both the Rice and Romeo Actions include allegations that SouthernCare improperly enrolled and billed Medicare and/or Medicaid for hospice care patients who were not terminally ill. *See* Docket No. 27-1; Docket No. 27-2. Both cases were dismissed as a result of a settlement agreement between Rice, Romeo, SouthernCare, and the Government in January 15, 2009. Docket No. 27-5; Docket No. 27-6.

> The Settlement Agreement from the Rice and Romeo Actions states that
>
> conditioned upon the Defendants' full payment of the Settlement Amount, the United States (on behalf of itself, its officers, agents, agencies, and departments) agrees to release the Defendants together with their current and former parent corporations; shareholders; direct and indirect subsidiaries; brother or sister corporations; divisions; current or former owners; and officers, directors, and affiliates, and the successors and assigns of any of them from any civil or

7

administrative monetary claim the United States has or may have for the Covered Conduct under the common law theory of unjust enrichment.

Docket No. 27-5, at 5; Docket No. 27-6, at 5. "Covered Conduct" involves allegations that SouthernCare "submitted reimbursement claims to Medicare for treatment of certain patients for hospice care who did not meet the applicable eligibility criteria under the hospice benefit" during the period from January 1, 2000, to September 1, 2008. Docket No. 27-5, at 4; Docket No. 27-6, at 4.

The Court agrees that the settlement agreement bars the Relators from bringing, on behalf of the Government, claims based on conduct from January 1, 2000, to September 1, 2008. Those claims are "Covered Conduct" for which the Government released SouthernCare from liability. *See* Docket No. 27-5, at 4; Docket No. 27-6, at 4. The Relators acknowledge this fact in their opposition brief.[6] See Docket No. 47, at 2 (stating that the settlement agreement "covers only fraudulent actions of the Defendant from January 1, 2000 through September 1, 2008," and that the allegations of the Complaint "are clearly based upon fraudulent practices which were continued by the Defendant even after the settlement of the litigation in Alabama").

The Relators' claims arising out of SouthernCare conduct occurring after September 1, 2008, however, are not barred by the settlement agreement because such claims were not litigated and thus are not included in the Rice and Romeo settlement agreements. *See* Docket No. 27-5, at 4; Docket No. 27-6, at 4.

SouthernCare also contends that the Relators fail to allege fraud with particularity because there is no evidence of a purported scheme to submit false claims. Docket No. 50, at 6.

---

[6] Because the Relators do not dispute that any claims regarding SouthernCare's conduct occurring from January 1, 2000, to September 1, 2008, are barred by the terms of the settlement agreement, the Court need not analyze the elements of *res judicata* and collateral estoppel as argued in SouthernCare's supporting memorandum.

SouthernCare argues that the Relators' Complaint refers to individuals by descriptions such as "Registered Nurse," "nurse," "the Clinic," "Clinical Director," or "the Director," but provides "no detail of how these individuals allegedly participated in a scheme to submit false claims." *Id.* Simply alleging that these individuals contributed to a pattern and practice of submitting false claims while relying on the fact that "Defendant would have access to the files of the patients identified in the Complaint," according to SouthernCare, is insufficient because the allegation fails to set forth the date, place, participants, or how the scheme unfolded. *Id.* at 6-7.

In response, the Relators argue that the allegations in Count One of their Complaint comport with the *Grubbs* standard because those allegations include dates, patient initials, and SouthernCare identification numbers. *See* Compl. ¶ 24; *Grubbs*, 565 F.3d at 185-92. In addition, the Relators redirect the Court to the allegations that indicate Medicare was billed for treatment of patients even where no services were provided. Docket No. 45, at 5.

The Relators' Complaint includes more than simply inferences that SouthernCare billed the Government for services provided to patients that were ineligible for hospice care. For example, the Complaint includes the following specific allegations:

> On January 19, 2009, patient G.J., SC #12409008, was admitted to Hospice with SouthernCare, even though the patient did not qualify for Hospice. Medicare was nonetheless billed for services rendered. Additionally, the patient's certification documents were not dated nor signed by an attending physician, resulting in the patient's treatment being rendered without an order signed by a physician.

Compl. ¶ 24(b).

> On December 12, 2008, patient C.S., SC #12408094, was admitted to SouthernCare without a treating physician's signed certification. The patient was subsequently discharged. However, a nurse with SouthernCare discovered upon visiting the patient within a week of

9

>his discharge, that the patient who had walked away from his home to visit friends, and reported to her that he does outdoor activities, such as walking and visiting with friends. Even though this patient's initial certification documents were not signed by a treating physician, Medicare was billed by SouthernCare.

Compl. ¶ 24(e).

>On September 18, 2008, patient F.P., SC #124088069, was admitted to SouthernCare despite lacking an order being signed by a physician. A nurse at SouthernCare faxed the patient's Initial Certification papers to the cardiologist physician, who had allegedly ordered the patient on Hospice. Subsequently, a nurse at the cardiologist's office called the nurse at SouthernCare and informed her that the physician would not sign the papers, since he did not order the patient into Hospice. The nurse reported this to her Clinical Director at SouthernCare, and the Director informed her that it was a different physician with the same specialty and same name. The Director informed the nurse that she would take care of the signatures. This patient's file contains a bill to Medicare; however, there was not [sic] signature by the ordering physician.

Compl. ¶ 24(f).

>On January 20, 2009, patient J.S., SC #12409010, was enrolled in SouthernCare's Hospice service, whose certification forms were signed by a physician, who had not seen nor examined said patient in more than twenty years.

Compl. ¶ 24(g).

These allegations are enough to satisfy Rule 9(b).

However, SouthernCare's argument that the Relators have not pled with particularity claims of company-wide fraud has merit. In their Complaint, the Relators state that they "have witnessed so many cases in which these types of fraud are apparent that they *feel* the fraud is systematic and widespread throughout SouthernCare's practice." *See* Compl. ¶ 5 (emphasis added). The Complaint also includes a statement that "SouthernCare issued a statement to

employees that patients could qualify for Hospice care if they had a life-threatening illness, not necessarily a terminal illness with a fixed negative prognosis," but the allegation does not suggest that the statement came from SouthernCare's corporate office or that the policy was implemented throughout SouterCare's locations. Compl. ¶ 16. In Rieder's Affidavit, she notes that "[f]rom corporate office came the pronouncement that there would be quotas," but again, such a statement does not alone support a claim of widespread fraudulent practices. Docket No. 46-1, at 5.

Although discovery may reveal that the alleged fraud goes far beyond the four Mississippi offices about which the Relators claim knowledge of fraud,[7] at which time they make seek to amend their Complaint, *see Epitech, Inc. v. Cooper Wiring Devices, Inc.*, No. 11-CV-1693-JM-WVG, 2012 WL 90476, at *3 (S.D. Cal. Jan. 10, 2012); *LOL Finance Co. v. Johnson*, No. 4:09-CV-3224, 2010 WL 4386491, at *4-6 (D. Neb. Oct. 27, 2010), the Relators have not adequately alleged facts to support their belief of company-wide fraud. As such, the Relators' claims pertaining to SouthernCare facilities other than the Mississippi facilities at which the Relators assert knowledge of fraudulent practices are dismissed without prejudice.

**B. Count Two: Conspiracy**

The version of 31 U.S.C. § 3729(a)(3) applicable to our case makes liable any person who "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid."[8] *Id.* To prove an FCA conspiracy, a relator must show "(1) the existence of an unlawful agreement between defendants to get a false or fraudulent claim allowed or paid by the

---

[7] The Relators allege that they "have knowledge of fraudulent practices in [SouthernCare's] Clinton, Jackson, Flowood, and Yazoo City offices." Docket No. 47, at 2.

[8] The FCA's conspiracy provision for conduct occurring on or after May 20, 2009, is 31 U.S.C. § 3729(a)(1)(C).

Government and (2) at least one act performed in furtherance of that agreement." *Grubbs*, 565 F.3d at 193 (citation and brackets omitted). General civil conspiracy principles apply to an FCA conspiracy claim. *United States ex rel. Jamison v. McKesson Corp.*, No. 2:08CV214-SA-DAS, 2009 WL 3176168, at *14 (N.D. Miss. Sept. 29, 2009).

Because a conspiracy requires an agreement between two or more persons, *see id.*, the intra-corporate conspiracy doctrine provides that a "corporation cannot conspire with itself any more than a private individual can, and it is the general rule that the acts of the agent are the acts of the corporation." *Hilliard v. Ferguson*, 30 F.3d 649, 653 (5th Cir. 1994) (quotation marks and footnote omitted) (explaining conspiracy principles in the context of 42 U.S.C. § 1985(3)). A corporation is, therefore, incapable of conspiring "with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *United States ex rel. Fago v. M & T Mortg. Corp.*, 518 F. Supp. 2d 108, 117 (D.D.C. 2007); *see also Suttles v. U.S. Postal Service*, 927 F. Supp. 990, 1002 (S.D. Tex. 1996) ("[A] corporation cannot conspire with itself through its agents or employees when the acts of the agents or employees are within the scope of their employment."). An exception to this rule arises in "the rare instance in which employees have an independent personal stake in achieving the object of the conspiracy." *H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 244 (5th Cir. 1978).

The Relators' conspiracy count alleges that "SouthernCare, in concert with its principals, agents, and employees, . . . agree[d] to submit false claims to the United States," and "acted in furtherance of an agreement, design, scheme or plan, with the intent to defraud the United States by submitting false claims for payment or reimbursement through Medicare and/or Medicaid." Compl. ¶¶ 35-37. SouthernCare argues that because a corporation typically cannot engage in a

12

conspiracy solely with its own principals, agents, and employees, the Relators' conspiracy allegation fails to state a claim. Docket No. 28, at 14-15. On this point, SouthernCare also argues that the Relators fail to offer any evidence of a purported agreement to conspire or any overt acts taken in furtherance of a conspiracy. Docket No. 50, at 8.

Indeed, the Relators' Complaint does not allege an agreement between SouthernCare and any individual or company other than its own "principals, agents, and employees." Furthermore, the Relators do not allege that SouthernCare's agents or employees were working outside their employment capacities or had interests wholly separate from their connection to SouthernCare when they supposedly "conspired" with SouthernCare. Because the Relators fail to offer sufficient allegations of a conspiracy between SouthernCare and an outside party, the conspiracy claim fails.

While the lack of allegations that SouthernCare conspired with another person alone makes the Relators' conspiracy claim fatal, SouthernCare also argues that the Relators' conspiracy allegations have not been pled with particularity as required by Rule 9(b). The Court agrees that the conspiracy count includes only general and conclusory allegations and lacks specific details that would put SouthernCare on notice of the basis of the conspiracy allegations against it. As such, the conspiracy count is dismissed.

**C. Count Three: Fraud, Suppression, and Deceit**

The Relators did not adequately brief their opposition to the Defendant's Motion to Dismiss Count Three on state law claims of fraud, suppression, and deceit. As such, they have abandoned Count Three. *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (concluding that plaintiff's failure to defend her "retaliatory abandonment" claim in

13

response to the defendant's motion to dismiss constituted abandonment of the claim); *Dean v. One Life Am., Inc.*, No. 4:11-CV-203-CWR-LRA, 2013 WL 870352, at *2 (S.D. Miss. Mar. 7, 2013) (holding that by failing to address the defendant's argument in her response, the plaintiff abandoned her claim); *Alexander v. Brookhaven Sch. Dist.*, No. 3:07-CV-640-DPJ-JCS, 2009 WL 224902, at *4 (S.D. Miss. Jan. 28, 2009) (stating that the plaintiff "appears to have abandoned [her Equal Pay Act] claim having not defended it" in her response to the defendant's motion to dismiss), *aff'd*, 428 F. App'x 303 (5th Cir. 2011).

### D. Counts Four and Five: Kickbacks

Counts Four and Five of the Relators' Complaint include allegations that SouthernCare violated federal anti-kickback laws. Two laws are at issue. The first, the Stark Law, 42 U.S.C. § 1395nn, "prohibits physicians from referring Medicare patients to an entity for certain 'designated health services,' including inpatient and outpatient hospital services, if the referring physician has a nonexempt 'financial relationship' with such entity." *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997) (citing 42 U.S.C. § 1395nn(a)(1), (h)(6)). The second, the Medicare anti-kickback statute, prohibits (1) the knowing and willful offer or payment of remuneration to induce a person to refer an individual to another person for services that will be paid for, at least in part, under a federal health care program, or to "purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program"; and (2) the knowing and willful solicitation or receipt of remuneration in return for such referral, purchase, lease, order, or arrangement. 42 U.S.C. § 1320a-7b(b)(1)-(2) (2006).

14

While a violation of the Stark Law or the Medicare anti-kickback statute would not, without more, create a cause of action under the FCA at the time the Relators filed this *qui tam* action, false certifications of legal compliance with the laws created liability under the FCA at that time.[9] *Thompson*, 125 F.3d at 902. As explained below, however, both Counts Four and Five are due to be dismissed because the Relators have failed to plead the claims with particularity as required by Rule 9(b).

### 1. Count Four: Stark Law

According to the Relators, SouthernCare violated the Stark Law because it had a financial relationship and obligation to some of its practicing physicians who made self-referrals to SouthernCare. Compl. ¶ 49. The Relators assert that the government paid SouthernCare as a result of treatment rendered to patients who were referred by physicians who had a financial relationship with SouthernCare. *Id.* ¶ 51.

SouthernCare argues that the Stark Law claim was not pled with particularity in accordance with Rule 9(b). Additionally, it points out that the Relators' Stark Law kickback claim fails because the Relators have not alleged that the referrals were for designated health services described in the Stark Law, *see* 42 C.F.R. § 411.351. Docket No. 28, at 15-16. According to SouthernCare, hospice services are not "designated health services," so there can be no violation of the Stark Law. *Id.*

---

[9] "[T]he Patient Protection and Affordable Care Act of 2010 . . . provides that violations of the Anti-Kickback statute automatically render a claim false, but . . . the Affordable Care Act only applies to FCA claims filed after its enactment. For claims filed before then, [the Fifth Circuit] does not recognize automatic FCA liability for Anti-Kickback violations." *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 478 n.9 (5th Cir. 2012) (citing *Thompson*, 125 F.3d at 902).

In response, the Relators insist that the details regarding the Stark Law violations are adequately pled. Docket No 45, at 6. For instance, the Relators point the Court to details provided in Paragraph 17 of the Complaint:

> SouthernCare started a program among its employees called "Pass it On." This program strongly encouraged nurses to send leads for new patients to be integrated in the program by the new standard. SouthernCare announced that there would now be quotas for a certain number of admissions per month and a certain number of new admissions per month. SouthernCare informed employees that there would be seven hundred-fifty dollars ($750.00) bonuses paid to those who achieved the quota. This was viewed by employees as compensation for remaining silent as to the fraudulent practice of SouthernCare.

Compl. ¶ 17. Additionally, the Relators assert that the Complaint's examples of SouthernCare's allegedly fraudulent activity creates "a strong implication that physicians were also involved in referring patients to Defendant." Docket No. 45, at 6.

The Relators' Stark Law allegations fall short of meeting the standard set forth in Rule 9(b). The Relators have not identified one physician who has referred patients to SouthernCare and who has a financial relationship with SouthernCare. Nor have the Relators identified a patient who was referred to SouthernCare by a physician who has a financial relationship with SouthernCare. They have merely made the general allegation that "SouthernCare has routinely violated the Stark Law." Compl. ¶ 15. That is not enough.

Recognizing the lack of particular facts and relying on *Grubbs*, the Relators urge that because such details "would be in the control of Defendant, the Rule 9(b) standard should be relaxed." Docket No. 45, at 6-7. The Relators have misconstrued the *Grubbs* standard. Even when most of the relevant records are in the defendants' possession, *Grubbs* requires that an FCA claim include, at a minimum, "particular details of a scheme to submit false claims paired

16

with reliable indicia that lead to a strong inference that claims were actually submitted." *Grubbs*, 565 F.3d at 190. "Reliable indicia" includes information that "gives defendants adequate notice of the claims" against them. *Id.* at 190-91. In *Grubbs*, examples of such reliable indicia included "dates and descriptions of recorded, but unprovided, services and a description of the billing system that the records were likely entered into." *Id.* at 191. The Relators' Stark Law allegations do not include any particular details of a scheme or reliable indicia that claims having false certifications of Stark Law compliance were submitted to the Government. The Relators have not provided SouthernCare with any information to apprise it of the basis of the Relators' Stark Law allegations. Instead, the Stark Law allegations appear to be based on speculation that the Relators hope to substantiate through discovery if the claim were to survive. However, Rule 9(b) is designed to prevent litigants from "gain[ing] access to a 'fishing expedition,'" *id.* at 191, and Count Four fails to meet the requirements of the rule.[10]

2. Count Five: Anti-Kickback Statute

The Complaint alleges that "SouthernCare and/or its principals, agents, or employees compensated persons and/or businesses for referring and signing new patients for Hospice care with SouthernCare" by issuing gift cards to the referring persons and/or businesses. Compl. ¶¶ 54-55. In response to SouthernCare's argument that the Relators' anti-kickback claim was not pled with particularity, the Relators point to Paragraph 19 of their Complaint, which states that

> Deloris Harris, a Community Relations Director at SouthernCare, offered gift cards to nurses, and encouraged them to bring in new patients. Upon information and belief, several nurses at SouthernCare received gift cards for recruiting new patients.

---

[10] The Court need not reach the Defendant's argument that the Stark Law does not apply to hospice care.

Compl. ¶ 19.

Again, these allegations are inadequate to satisfy the requirements of Rule 9(b). The Relators fail to identify any nurse, patient, or other person or business that received a gift card or any type of compensation for referring a Medicare patient to SouthernCare. Further, the Relators provide no time frame for their accusations that Deloris Harris offered and issued gift cards to nurses for recruiting patients. In sum, the Relators have not sufficiently described a scheme to violate the anti-kickback statute, and they have not provided reliable indicia that an illegal referral led to SouthernCare submitting to the Government a Medicare claim that included fraudulent certification of compliance with the anti-kickback statute. *See Thompson*, 125 F.3d at 902. Thus, the Relators have not adequately stated a claim as required by Rule 9(b) and the *Grubbs* standard.[11]

### IV. CONCLUSION

For the foregoing reasons, the Motions to Dismiss filed by SouthernCare (Docket Nos. 27, 29, 31) are GRANTED IN PART and DENIED in Part. Count One survives.

**SO ORDERED**, this the 30th day of March, 2013.

                                                        s/ Carlton W. Reeves
                                                       UNITED STATES DISTRICT JUDGE

---

[11] In its rebuttal, SouthernCare argues for the first time, in a footnote, that gift cards "would not be considered prohibited remuneration under the Anti-Kickback Statute due to the protections afforded under the safe harbor to the Anti-Kickback Statute for employees." Docket No. 50, at 11 n.11 (citing 42 C.F.R. 1001.952(i)). Because this argument was not presented in SouthernCare's initial brief, and the Relators, therefore, had no opportunity to address it in their response, the Court declines to consider the argument. *See Johnson v. Wal-Mart Stores E., LP*, 3:12-CV-21-CWR-FKB, 2013 WL 395975, at *3 & n.1 (S.D. Miss. Jan. 31, 2013) (citation omitted) ("[T]he reply memorandum is not the appropriate place to raise new arguments.").